**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

MEROUANE LAKEHAL-AYAT,

*Plaintiff,*

v.

ST. JOHN FISHER COLLEGE,
GERARD ROONEY,
KEVIN RAILEY,
RAMA YELKUR, AND
MARCIA O'BRIEN,

*Defendants.*

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Dr. Merouane Lakehal-Ayat ("Plaintiff" or "Dr. Lakehal-Ayat"),
complaining by his attorney, Peter J. Glennon, Esq. of The Glennon Law Firm, P.C.,
alleges the following as his complaint against St. John Fisher College (the "College"),
Gerard Rooney, Kevin Railey, Rama Yelkur, and Marcia O'Brien (collectively
"Defendants"):

## NATURE OF THE ACTION

1.     Plaintiff brings this civil action seeking at least $1,000,000.00 in damages
and injunctive relief against the College and its administration and employees, in their
respective professional, official, and individual capacities.

2.     This case is about a college administration that failed in its obligations to
follow the law, its own rules, to comply with the express terms of its contract with a
tenured and highly-regarded professor, permitted and condoned unlawful discrimination,
and encouraged unlawful and improper retaliation and bullying against Plaintiff.

3.     It is a case about one respected man, Dr. Lakehal-Ayat, who was
persecuted and discriminated against because of who he is and what he believes. And

then further mistreated by an inexperienced college administration that failed to consider his rights as it drove toward a predetermined, false, conclusion.

4.      As these matters typically go, one person started the discrimination. When Dr. Lakehal-Ayat complained about the discrimination, he was then retaliated against for complaining. Turning a blind eye to the discrimination and retaliation, others in higher leadership positions joined in the retaliation against Plaintiff, the older, Muslim from Algeria, who looked and spoke differently than the others.

5.      The retaliation appears to have continued due to the inexperience and incompetence of the College administration, poor counsel that it received, and lack of leadership by the President, Provost, Dean, and Department Chair.

6.      The issues presented in this case started with improper discrimination, grew to retaliation, and quickly spread to the trampling of Plaintiff's rights and breaches of his contract, by the highest levels of College administration.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to 42 U.S.C. 2000e-5(f), 28 U.S.C. §§ 1331 and 1343(4). The Court has jurisdiction over the state law claims brought in this action pursuant to 28 U.S.C. §1367(a).

8.      Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b) because the claim arose in this judicial district, Plaintiff resides in this judicial district, and the Defendants reside and maintain a place of business within the District.

9.      This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §2201 and §2202.

2

10.     Plaintiff filed a timely charge of discrimination against Defendant with the Equal Employment Opportunity Commission (hereinafter "EEOC") and brought this action within ninety (90) days of the receipt of a Notice of Right to Sue, which was issued by the EEOC on September 24, 2018, a true and correct copy of which is attached hereto as **Exhibit A**.

11.     Plaintiff has not commenced any other proceeding in any other forum involving the alleged unlawful employment practices that were the subject of the EEOC charge.

## THE PARTIES
## AND FACTS

### Plaintiff Dr. Merouane Lakehal-Ayat

12.     Plaintiff is an individual who resides in Monroe County, New York, a location within the Western District of New York.

13.     He is an employee of St. John Fisher College, which is a higher education institution located in Monroe County, New York.

14.     At all times relevant to this Complaint, Plaintiff was a "person" as defined by the relevant laws.

15.     At all relevant times, Plaintiff was 70 years old or more.

16.     Plaintiff is a naturalized citizen of the United States and English is his second language, although he speaks several languages.

17.     Plaintiff is and has been a beloved tenured professor of finance at the College since September 1, 1992.

3

18.    Each year Plaintiff receives a written salary notification for tenured faculty members ("Tenure Letter").

19.    The Tenure Letter confirms that a tenured faculty member's "appointment continues to be subject to the provisions of the Faculty Statutes, . . . the 'Standards of Conduct' policy which is contained in the Employee Handbook and all other College policies, rules and regulations[.]"

20.    Plaintiff holds a Diploma from Ecole Nationale d'Administration, an institution in Algeria, which he received in 1973. Dr. Lakehal-Ayat has additionally received a Masters in Business Administration ("MBA") in Finance from the University of Denver in 1979, a Masters in Management, with a focus on International Management from the University of Denver in 1980, a Masters of Arts, with a focus of International Relations from the University of Denver in 1981, and a Ph.D. focusing on International Finance and Economics from the University of Denver in 1989.

21.    Plaintiff is a five-time Fulbright Fellow. Dr. Lakehal-Ayat has spent time teaching internationally serving as a Fulbright Program Specialist, a title he has held since 2002 and continues to hold.

22.    Dr. Lakehal-Ayat is a devout Muslim who was educated by Jesuits and appreciates and respects the Christian religion.

23.    As a tenured professor of finance, Dr. Lakehal-Ayat reports to the Chair of the Accounting and Finance Department within the College's School of Business, who in turn reports to the Dean of the Business School, who reports to the College's Provost, who reports directly to the College's President, who reports to the College's Board of Trustees.

4

24.     Throughout Dr. Lakehal-Ayat's career at St. John Fisher College, he has been an exemplary employee and faculty member who has always received excellent performance evaluations. In fact, Plaintiff has received the highest faculty award issued by the College on four occasions.

25.     Plaintiff has been discriminated against and suffered a hostile work environment by the College and its agents due to his national origin, religious beliefs, and age; and Plaintiff has been retaliated against for complaining of such discrimination and of the hostile work environment.

26.     Further, the Defendants have repeatedly breached Plaintiff's employment contract with the College.

### St. John Fisher College

27.     Upon information and belief, at all times relevant to this Complaint, Defendant St. John Fisher College is a private educational institution and an employer under the relevant federal and state laws referenced herein.

28.     The College is beloved by Plaintiff and many other employees and alumni.

29.     The College is accredited by the Middle States Commission on Higher Education ("MSCHE").

30.     In the past, the College's Business School has received additional accreditation by the Advance Collegiate Schools of Business International ("AACSB").

31.     Unfortunately, as of the date of this Complaint, under Drs. Rooney, Railey, and Yelkur, the College's Business School has failed to obtain formal renewal of the AACSB accreditation.

5

32.     Upon information and belief, the AACSB accreditation has not been renewed in part due to the College improperly classifying Plaintiff's scholarly work in its attempt to discriminate, retaliate, and force him out.

33.     Upon information and belief, under this administration, enrollment in the Business School has dropped by approximately 15%.

### College President Gerard Rooney

34.     The President is a male of an age believed to be younger than Plaintiff. His religion is unknown other than he is not Muslim.

35.     He is relatively new at his position, having become College president in July of 2015.

36.     Dr. Rooney joined St. John Fisher College in 1996 as a member of the president's senior staff. His roles included executive vice president for enrollment, advancement, and planning.

37.     Dr. Rooney holds an undergraduate degree in sociology from Villanova University and has his Master's degree in Educational Administration and Supervision at Fairfield University. Dr. Rooney has received a Doctoral degree from the Department of Educational Leadership and Policy, Higher Education Program, at the University at Buffalo, State University of New York.

38.     As further alleged herein, the President violated numerous sections of the Faculty Statutes in his support of the Provost's, Dean's, and Chair's unlawful actions and the collective mishandling of false allegations asserted against Plaintiff.

### College Provost Kevin Railey

39.     The Provost is a male of an age believed to be younger than Plaintiff. His religion is unknown other than he is not Muslim.

40.     The Provost is also relatively new at his position, having started in July of 2016. He previously served as the Dean of adult education programs at Buffalo State College, a school within the State University of New York college system ("SUNY").

41.     Provost Railey received a bachelor's degree in English from the State University of New York at Albany and a Master's degree and a Ph.D. in English from the State University of New York at Stony Brook.

42.     The Provost has expressly stated that he and the College will hire only Citizens of the United States. Upon information and belief, he has stated in an email to faculty that only United States Citizens may be hired in faculty positions at St. John Fisher College.

43.     As further alleged herein, the Provost violated numerous sections of the Faculty Statutes in his mishandling of false allegations asserted against Plaintiff.

### Dean Rama Yelkur

44.     Dean Rama Yelkur is a female of Indian descent of an age believed to be younger than Plaintiff. Her religion is Hindu. The Dean is relatively new at her position, having been hired by the College in 2016.

45.     Dean Yelkur received her Bachelor's degree in mathematics in 1986. She then received an MBA from the PSG College of Technology in India in 1988. Dean Yelkur earned her Doctorate in Business Administration in Marketing from Mississippi State University in 1995.

7

46.     Dean Yelkur's academic career began at Texas A&M International University as an Assistant Professor of Marketing from 1995 to 1998. She then joined the faculty of the University of Wisconsin-Eau Claire, where she was a Professor of Marketing and Director of International Business Programs, until 2013. Then, Dean Yelkur served as a dean at Saginaw Valley State University in Michigan immediately prior to joining St. John Fisher College.

47.     Upon information and belief, the Dean prefers hiring faculty members who are of Indian descent, preferably followers of Hinduism. Upon information and belief, on at least two separate occasions, the Dean has rejected the Business School faculty choice for faculty hires, instead seeking to hire her preferred candidates over the faculty's professional, academic, and experienced based objections.

48.     The Dean manipulated students to mischaracterize their experiences with Plaintiff in her effort to seek Plaintiff's dismissal from the College, due to her discriminatory animus toward Plaintiff.

49.     The Dean fabricated allegations and facts to present Plaintiff to others in a false light.

**Former Department Chairperson Dr. Marcia O'Brien**

50.     The former chair of Plaintiff's department is Dr. Marcia O'Brien, who is a female of an age believed to be younger than Plaintiff. Her religion is unknown, other than she is not Muslim.

51.     Upon information and belief, subsequent to Plaintiff being subjected to the discrimination and while the retaliation and contract breaches continued, the College replaced Dr. O'Brien as department Chair.

8

## The Dean's Discriminatory Animus

52.     The Dean demonstrated her preference of hiring professors of Indian heritage who practiced the Hindu religion.

53.     As one example, in searching for a new faculty member, the Dean favored a candidate who was Indian and Hindu, but was inexperienced compared to another candidate, who happened to be of African descent and Muslim background, although he practiced Christianity, and who was supported by the faculty.

54.     The Dean's disdain for Dr. Lakehal-Ayat first manifested into actionable discrimination in May 2017 when, despite a strong review from his department chair Dr. O'Brien, and his prior exceptional academic record, the Dean denied a salary increase to Plaintiff.

55.     Dr. Lakehal-Ayat was the only tenured College faculty member not to receive a pay raise throughout the entire College tenured faculty.

56.     Dr. Lakehal-Ayat complained to the Chair and Provost that the denied pay raise was discriminatory against Plaintiff based on who he is and retaliatory because Plaintiff did not support the Dean's favored Indian faculty candidate.

57.     The Provost ultimately reversed the Dean's decision, but awarded Plaintiff only a 2% salary increase.

58.     All other faculty members received greater raises, specifically 2.5% for tenured faculty who were deemed fully satisfactory, and 3.0% for tenured faculty members exceeding expectations.

59.     The failure to first approve a raise and then to finally approve a raise less than other faculty members of lesser or equal qualifications was due to unlawful

discrimination and retaliation based on Dr. Lakehal-Ayat's religion, national origin, and age, and retaliation for having complained about the Dean's discriminatory action.

### Retaliation Against Dr. Lakehal-Ayat

60.    The Dean became frustrated that she was overruled by the Provost and incensed that Plaintiff received a salary raise. But she was more incensed that Dr. Lakehal-Ayat had complained of her discriminatory treatment toward him. Immediately thereafter, she continued to discriminate and retaliate against Plaintiff unlawfully.

### A.    Removal from Investment Club Advisor Role

61.    The Dean sought to have Plaintiff removed from his voluntary position as faculty advisor to the Student Investment Club, a position Plaintiff had held for 18 months. The students of the Investment Club rebuked her efforts and even wrote letters of support for Dr. Lakehal-Ayat. But she persisted and upon her later second attempt at his removal, she manipulated the Investment Club students to remove Plaintiff as the faculty advisor.

### B.    Denied Opportunity to Teach Graduate Courses

62.    Then, in the Fall 2017 semester, the severe and pervasive harassment and discrimination by the Dean continued when the Dean informed Plaintiff that he would no longer be able to teach graduate level courses. No reason was provided. Notably, Dr. Lakehal-Ayat had been successful in teaching graduate level courses at the College for 32 years. He had even created one of the courses that he was then denied the opportunity to teach.

63.     Denying Plaintiff the opportunity to teach graduate-level courses also denied Plaintiff additional compensation from the College when teaching overload semesters.

64.     At St. John Fisher College, it is typical for a professor to teach 3 courses per semester. When needed, some faculty members will take on an additional fourth course, which is considered to be an overload semester. Faculty members then receive additional compensation for teaching an additional course.

C.     **Challenging Plaintiff's Scholarly Work**

65.     In the beginning of the Fall 2017 semester, Plaintiff gave notice to former Department Chair Dr. O'Brien of his paper titled *"A Big Data Bayesian Approach to Earnings Profitability in the S&P 500"* being officially accepted for publication by the peer reviewed PSU Review Journal, including proof of acceptance.

66.     As part of the College's guidelines, Dr. O'Brien informed Dr. Lakehal-Ayat his publication information must be entered into Sedona in order to be reviewed and updated.

67.     Sedona is a self-service web database application that allows members to maintain their teaching, research, service, experience, development, credentials, and assessment records.

68.     Dr. O'Brien congratulated Dr. Lakehal-Ayat in an email sent throughout the School of Business on September 11, 2017 informing everyone that Plaintiff's publication had been accepted in the PSU Review Journal.

69.     However, on September 13, 2017, Dr. Lakehal-Ayat was contacted by the Dean's Assistant informing him that PSU Research Review: An International Journal was

11

not listed on the Australian Business Deans Council ("ABCD") list, and further informed Plaintiff that his publication could not be included in Sedona as a reputable Peer Review Journal ("PRJ") for scholarly engagement of Scholarly Academic ("SA") status.

70.     This was surprising to Plaintiff, in part because the leading academics in his field had published in that journal.

71.     The Dean's assistant then emailed Dr. Lakehal-Ayat informing him that one of his prior publications titled, "*A Crippled Convict*" was now under question by the Dean after previously being accepted the previous April.

72.     The Dean's assistant shared that the Dean was not agreeable to the journal in which "A Crippled Convict" was published. The Dean's assistant then forwarded the information to the College's Research and Publications Committee ("RP Committee") for review and comment.

73.     The journal being disputed by the Dean was reputable. Dr. O'Brien informed Plaintiff that further discussion was necessary; however, she and the Dean intentionally delayed that discussion, further harming Plaintiff's reputation and standing.

74.     Upon information and belief, Dean Yelkur had asked the RP Committee to delay consideration of the journal in which Plaintiff's paper was published until after the upcoming AACSB reaccreditation visit, with the intent of harming Plaintiff and blaming denial or reaccreditation, in part, on Plaintiff.

75.     This intentional delay by Dean Yelkur and Dr. O'Brien was made with the intention of attempting to tarnish Plaintiff's professional image and make it appear as if he had not conducted any scholarly work since the previous year.

76.     Later, at Plaintiff's request, Dr. O'Brien asked Dean Yelkur to continue the process at the RP Committee level, but Dean Yelkur explicitly refused the request.

77.     Ultimately, the Dean never provided an explanation, neither written nor oral, to Plaintiff as to why his publications were being challenged five months after being previously accepted.

78.     Dean Yelkur and Dr. O'Brien targeted Dr. Lakehal-Ayat repeatedly, which further tarnished his professional reputation.

### D.     Attempted Forced Retirement and Hostile Work Environment

79.     On November 14, 2017, Dr. O'Brien summoned Plaintiff to the Provost's office to demand that he retire or be terminated.

80.     Present at the November 14, 2017 meeting were the Provost, Dean, Chair, and Vice President of Human Resources Elizabeth Skrainar (collectively "the College Representatives").

81.     The College Representatives, led by the Provost, made ambiguous and unclear allegations against Dr. Lakehal-Ayat about his classroom management, while questioning his integrity and teaching performance.

82.     With no basis, the College Representatives accused Plaintiff of not teaching his own classes and having students handle his faculty responsibilities, which were preposterous and broad allegations without any factual basis.

83.     The College Representatives told Dr. Lakehal-Ayat at that meeting that he had to resign immediately or else the College would force a hearing to strip him of his tenure and to publically embarrass him and damage his reputation.

13

84.    The Provost repeatedly stated that he was "100% confident" that Dr. Lakehal-Ayat would be terminated.

85.    Plaintiff asked what the allegations were against him, however, the College Representatives refused to present any particular allegations.

86.    The Provost told Dr. Lakehal-Ayat that written allegations would be shared with him, but that Plaintiff needed to resign immediately or face termination of his tenure.

87.    Plaintiff declined to resign. At that time, Plaintiff was permitted to continue his teaching responsibilities. But Dr. Lakehal-Ayat was told that he had to decide between their two options, and was strongly encouraged to resign.

88.    Dr. Lakehal-Ayat continuously asked that the Provost, Dean, and Chair explain what allegations they were attempting to assert against him. They refused.

89.    Dr. Lakehal-Ayat was perplexed because he actually taught all of his classes, prepared his lesson plans and syllabi, prepared and graded homework assignments and exams, and had excellent relationships with his students.

90.    As explained herein, only later did Plaintiff learn that the College and its representatives were alleging that Plaintiff utilized students in the traditional role of teaching assistants ("Teaching Assistants" or "TAs").

91.    Plaintiff never denied using TAs. He was one of many College faculty members who used TAs.

92.    At all relevant times, the College did not have a written policy on the use of TAs.

93.     At all relevant times, the College did not have any policy in any form regarding the use of TAs.

94.     To the contrary, the College has a history and past practice of approving the use of TAs, and actually paying some TAs for the work. Attached hereto as **Exhibit B** is a true and correct copy of a College document previously authorizing the use of TAs for 9 professors, including Dr. Lakehal-Ayat.

95.     Although the College did not have any TA policy, most other colleges and universities do have TA Policies.

96.     SUNY, the entire system and from where the Provost hails, even has a written TA policy for the use of undergraduate students ("SUNY TA Policy"). Attached hereto as **Exhibit C** is a true and correct copy of the SUNY TA Policy.

97.     Dr. Lakehal-Ayat's use of TAs was done in compliance with the terms of the SUNY TA Policy.

98.     However, those facts were not satisfactory to the Defendants.

99.     Prior to Dr. Lakehal-Ayat being suspended on November 27, 2017 the College began surreptitiously recording Plaintiff's classes without informing him or the students.

100.    Upon information and belief, the day of Dr. Lakehal-Ayat's suspension, during his morning lectures, three of which are consecutive, Dean Rama Yelkur and another colleague were seen pacing outside of Plaintiff's classroom. These actions were uncommon.

101.     As Plaintiff began conducting his final lecture of the morning, College Campus Security guards were seen hovering outside his classroom. This action was also uncommon.

102.     On November 27, 2017, Dr. Lakehal-Ayat was again summoned to the Provost's office for another meeting with the College Representatives. There, the Provost told Plaintiff again that the Provost was "100% confident" that Dr. Lakehal-Ayat would be terminated by the College due to the use of TAs and, therefore, Dr. Lakehal-Ayat needed to resign immediately.

103.     Dr. Lakehal-Ayat again declined to resign and suggested that the parties' legal counsel were addressing the parties' numerous concerns.

104.     For an unknown reason, Dr. Lakehal-Ayat's suggestion infuriated the Provost, who immediately informed Plaintiff orally that he was suspended.

**Continued Retaliation, Breaches of Contract, and an Investigation Farce**

105.     The Provost immediately suspended Dr. Lakehal-Ayat for the remainder of the Fall 2017 fall semester – for refusing to resign.

106.     The Provost was adamant that Plaintiff gather all of his belongings and vacate his office and the College campus within 2 hours.

107.     At that time, only the Vice President of Human Resources, Ms. Elizabeth Skrainar, had the sense to object to the Provost's irrational, knee-jerk reaction. Ms. Skrainar stated that the time limitation was unreasonable, and finally the Provost relented, allowing Plaintiff the remainder of the day to vacate the College campus.

108.     Dr. Lakehal-Ayat was not provided any reason for this suspension.

109.     He was not even provided a written statement of his suspension.

16

110. The suspension was ordered in direct violation of the Faculty Statutes, which provides for suspension of a tenured faculty member only if there is an immediate risk of harm to himself or other persons. No such risk was present and the College Representatives certainly did not state that there was any such risk.

111. The College then assigned a replacement professor to complete Plaintiff's classes for the Fall 2017 semester.

112. On or about November 28, 2018, the replacement professor who is younger than Plaintiff, and not Muslim, defamed Plaintiff by falsely stating to Plaintiff's students that Dr. Lakehal-Ayat had been fired.

113. This fact, while defamatory, is also a fact demonstrating the caustic and vitriolic motivations by the College and its Representatives.

114. While Dr. Lakehal-Ayat was suspended he was banished from campus and his access to his office and College email were immediately cut off.

115. Further, former Chair Dr. Marcia O'Brien declared at two faculty meetings in the School of Business on or around the day the suspension occurred that Dr. Lakehal-Ayat had been fired and would not be returning to the College.

116. Dr. Lakehal-Ayat made several attempts to address the purported allegations internally, but no meetings were conducted. Plaintiff was never given a chance to tell his side of the story. Plaintiff was suspended without due process.

117. The College purported to conduct an investigation of the ambiguous allegations.

118.    However, that investigation consisted of the Provost asking Ms. Skrainar to confirm that a handful of students who complained to the Dean about Plaintiff actually complained.

119.    Then the Provost had Ms. Skrainar request from the few complaining students only documents that supported the ambiguous allegations.

120.    But there is more, the Provost had Ms. Skrainar cherry-pick documents supportive of the ambiguous allegations, avoiding any exculpatory evidence, to include in two binders of "official evidence."

121.    But to make matters even worse, names of witness who could dispel the ambiguous allegations were presented to Dr. O'Brien, but not one of them was ever contacted, let alone interviewed, by the College.

122.    Dr. Lakehal-Ayat, himself, was never even interviewed as part of the College's investigation.

123.    The College only suggested it had an interest in interviewing Dr. Lakehal-Ayat only after he complained of the discrimination and retaliation; and did so because it was concerned for its own legal liability.

124.    The utterly flawed nature of the College's investigation was proven at the subsequent Termination Hearing by, in part, the College Representatives own testimony.

125.    To this date, the previously noted college officials have been vocal about Plaintiff never returning to the College. The Provost and Dean have even hired a replacement professor on tenure track to replace Dr. Lakehal-Ayat. The Provost of the College has stated on several instances that "he is 100% confident that Plaintiff would not be returning."

18

126.   Dr. Lakehal-Ayat has done nothing wrong, yet he was bullied and suspended due to his national origin, religion, and age; and for complaining about this discrimination.

127.   Instead of actually investigating the allegations, the Provost sought to try to force Plaintiff to retire due to his age.

128.   The Provost believed that by forcing Plaintiff to retire, then he would not have to worry about the discrimination and retaliation issues arising from Dean Yelkur's treatment of Plaintiff.

129.   The Provost suspended Plaintiff in violation of the Faculty Statutes.

130.   The Provost has previously testified that his decision to suspend Dr. Lakehal-Ayat was later supported by the Board of Trustees Executive Committee.

131.   As she testified during the Termination Hearing, Dr. O'Brien encouraged Plaintiff to retire, due to his age and the numerous issues related to this lawsuit.

**Banishment, Grievances, & More Faculty Statute Violations**

**A.**     **Banishment**

132.   During the suspension, the College took no further action against Dr. Lakehal-Ayat.

133.   Plaintiff sought reinstatement for the Spring 2018 semester. However, the College denied Plaintiff's request.

**B.**     **Grievance for Improper Suspension**

134.   Due to the College's denial, Plaintiff filed an administrative grievance with the College.

135.   Upon information and belief, the Provost and President interfered and delayed the consideration of the grievance.

136.   The Grievance Committee finally acted on the grievance only after Plaintiff inquired as to its status and confirmed that information provided to it by the Provost was false.

137.   Upon information and belief, the Provost and President then further intimidated the Grievance Committee to the point of compelling the Grievance Committee to deny Plaintiff's suspension grievance for being untimely.

138.   However, it was understood that the Grievance Committee had grave concerns regarding Plaintiff's situation and desired investigating his claims further.

**C.    The Rank & Tenure Committee**

139.   Because the College had still failed to take any further action after suspending Dr. Lakehal-Ayat, Plaintiff himself submitted a letter to the College's Rank and Tenure Committee ("Rank & Tenure"), pursuant to Faculty Statute 3.13.1, seeking to have Rank & Tenure exercise its authority to informally investigate the suspension and allegations against Dr. Lakehal-Ayat.

140.   Plaintiff sent a letter on February 19, 2018 to the Co-Chairs of the College's Rank and Tenure Committee to request, pursuant to Faculty Statute 3.13.1, that this committee perform its duties and obligations to conduct an informal investigation into the allegations brought by Provost Railey and others, which resulted in the suspension of Dr. Lakehal-Ayat.

141. The Provost was incensed that Plaintiff made his request and ran to Rank & Tenure to explain that he and the President wanted Plaintiff dismissed from the College.

142. The Provost and President then quickly had Ms. Skrainar prepare an unsigned, anonymous, report to Rank & Tenure, intentionally mischaracterizing the allegations and facts and misleading Rank & Tenure as to such pertinent information as: the number of students who allegedly complained, inflating by duplicating the number of allegations and the length of time supposed inappropriate actions had been ongoing, among other things (the "Provost and President Report").

143. The Provost and President Report concluded by stating that: "It is the Provost and the President's view that any faculty member who has acted as Dr. Lakehal-Ayat, regardless of their race or religion, has failed to meet the minimum standards for teaching at Fisher and, for the good of the students and our institution, should not be permitted to teach any longer."

144. Notably, under the Faculty Statutes, President Rooney was not supposed to be involved with the investigation at this point. But the Provost and President Report make clear that he had impermissibly injected himself into the situation, in violation of the Faculty Statutes, and with the sole intent of unduly influencing the Rank and Tenure Committee.

145. On February 23, 2018, the Rank & Tenure Committee Chairwoman sent a letter to Dr. Lakehal-Ayat inviting him to make a presentation to the Rank & Tenure Committee in response to the Provost and President Report.

21

146.    This was the first time Dr. Lakehal-Ayat was actually invited to respond to the allegations against him.

147.    Plaintiff sent an email to the Rank & Tenure Chairwoman on March 2, 2018 confirming that he received her letter. He also objected to Provost Railey, who was listed as a member of the Rank & Tenure committee, being present because the issues to discuss included the Provost's improper actions.

148.    Dr. Lakehal-Ayat made the Committee aware that Faculty Statute 3.13.1, clearly stated that: "If a member of the Rank and Tenure Committee is involved as one of the principals in a case, that person shall not sit on the Committee when it investigates that case."

149.    Here, Provost Railey was not only involved as one of the principals, but Dr. Lakehal-Ayat had a pending grievance against him and was fearful that his presence at the meeting would greatly prejudice Plaintiff.

150.    The Rank & Tenure Committee asked the Provost to recuse himself, but he refused.

151.    Dr. Lakehal-Ayat was finally afforded an opportunity to present his side of the story when he met with the Rank and Tenure Committee on March 9, 2018. At that time, Plaintiff was able to further explain his perspective of the events, which was the truth of the matter.

152.    After presenting his remarks, Dr. Lakehal-Ayat offered to answer any questions presented by Rank & Tenure. They did not pose any questions.

153.    Prior to leaving, Dr. Lakehal-Ayat left each Committee member with a copy of his written responses to the College's allegations.

22

154. Plaintiff then sent another email to the Rank and Tenure Committee on March 21, 2018 expressing his gratitude for affording him the opportunity to speak with them, and went on to remind the Committee of their responsibilities. Dr. Lakehal-Ayat stated why he believed a formal proceeding should not occur and that the matter could end with a recommendation by the Rank & Tenure Committee.

155. Upon information and belief, the Rank and Tenure committee took no additional action. It considered the Provost and President Report and Dr. Lakehal-Ayat's presentation. But Rank & Tenure, for no known reason, took any other action to investigate the situation further under its authority, as the Faculty Statutes provide.

156. Upon information and belief, undue influence was exerted by President Rooney and Provost Railey on Rank & Tenure.

157. Upon information and belief, the Rank and Tenure Committee was set to finalize a 4 to 3 vote in favor of Dr. Lakehal-Ayat until a committee member with an opinion favoring Dr. Lakehal-Ayat could not attend the vote due to a health issue.

158. Thus, upon information and belief, the Rank and Tenure Committee deadlocked at 3 to 3. The Rank and Tenure committee took no further action.

159. Ultimately, upon information and belief, the President and Provost pressured the Rank & Tenure Chairwoman to sign a document formally commencing a formal proceeding to terminate Dr. Lakehal-Ayat's tenure.

160. Notably, the Rank & Tenure Chairwoman's signature is not required under the Faculty Statutes to commence a termination proceeding. But the President and Provost thought that by doing so they could create the appearance of righteousness in their improper actions.

23

161.    The College, again informed Dr. Lakehal-Ayat that he was never going to return and demanded that he retire and accept a retirement package. It was his last chance.

162.    Dr. Lakehal-Ayat's integrity would not allow him to agree to such a proposal and rejected it.

163.    Thus, Dr. Lakehal-Ayat received a letter from Dr. Rooney on April 20, 2018 notifying him that the College had commenced formal proceedings to terminate his tenured position, pursuant to Faculty Statute 3.13.2.

### The Tenure Termination Proceeding

164.    The College was forming an Ad Hoc Committee to decide whether Plaintiff should be terminated (the "Ad Hoc Committee" or "Hearing Committee").

165.    Upon information and belief, such a committee has never been formed ever in the history of the College. Under the Faculty Statutes the committee is supposed to be an impartial and an objective hearing committee.

166.    However, the College made reference to the fact that even if the Committee were to rule in Plaintiff's favor, the President and the Board of Trustees would nevertheless terminate Dr. Lakehal-Ayat.

167.    Indeed, the College has already hired a replacement for Dr. Lakehal-Ayat, who upon information and belief, is a woman, younger than Plaintiff, and who is not Muslim.

168.    The College and all defendants then continued their discrimination, retaliation, and blatant violation of Plaintiff's rights in preparing for the Termination Hearing.

24

169. The President sought to schedule the Termination Hearing during Plaintiff's religion's holy month of Ramadan.

170. The College was unwilling to work with Plaintiff's counsel of choice to schedule the hearing, discuss procedure, or other relevant information.

171. Under the Faculty Statutes, the College was required to assist Plaintiff in securing witnesses and other evidence.

172. However, the College refused to comply with its obligations.

173. The President refused to testify.

174. The College refused to obtain and share with Dr. Lakehal-Ayat evidence known to exist, including a written request by a student seeking an enhanced academic grade and standing for assisting the Provost in ousting Dr. Lakehal-Ayat.

175. The College also refused to obtain and share with Plaintiff available, non-confidential, information regarding the character and integrity of the chief complaining student, who was recruited by the Dean. This evidence included an order of protection issued by the College safety office against this student.

176. The College refused to provide or to even entertain additional witnesses who would support the true version of events.

177. Upon information and belief, Dean Yelkur even actively sought to recruit students to testify against Dr. Lakehal-Ayat during the Dismissal Hearing Proceeding and stated to one student, "if you don't come forward Plaintiff will walk away free."

178. Upon information and belief, there was exculpatory documentation in the College's possession that would have been favorable to Plaintiff during the Termination Hearing and the College refused to present it.

25

179.    Plaintiff submitted a July 3, 2018 letter to the Ad Hoc Committee requesting documents be secured pursuant to Faculty Statute 3.13.5, which requires the Committee to "secure the presentation of evidence important to the case."

180.    Dr. Rooney's counsel sent a letter to the Ad Hoc Committee on July 5, 2018 objecting to Dr. Lakehal-Ayat's document requests. In that letter, the President's Counsel inappropriately stated that the requested documents were "wholly unnecessary and irrelevant to the issues to be decided at the hearing." Notably, the President's counsel had unfettered access to the College records, student records, and documents in preparing her prosecution against Dr. Lakehal-Ayat.

181.    Plaintiff objected to this response. However, under pressure from the College, the Ad Hoc Committee never secured any evidence Plaintiff had requested.

182.    The Termination Hearing was then held over 5 days – July 11, 12, and 13 of 2018 and August 9 and 10 of 2018.

183.    Ultimately, the five-member Ad Hoc Committee ruled <u>unanimously</u> in Dr. Lakehal-Ayat's favor, recommending dismissal of all charges and reinstatement of Plaintiff.

### The UNANIMOUS Decision in Dr. Lakehal-Ayat's Favor

184.    The Ad Hoc Committee wrote a 29-page report, dated October 1, 2018 (the "Committee Report"), which was distributed to Dr. Lakehal-Ayat and President Rooney on October 2, 2018.

185.    The Committee Report concluded that all charges asserted against Dr. Lakehal-Ayat by the College, President, and Provost, be dismissed and that Dr. Lakehal-

Ayat be reinstated. Attached hereto as **Exhibit D** is a true and correct copy of the Executive Summary of the Committee Report.

186.    It must be noted that one of the unanimous Ad Hoc Committee members was the very same Chairwoman of the Rank & Tenure Committee, who was pressured to sign the charging statement. She also was the President's hand-selected choice to sit on the Ad Hoc Committee.

### Report Cites Numerous Faculty Statute Breaches by College Administration

187.    The Report includes an Appendix, which states numerous procedural failures and flaws by the College and Drs. Rooney, Railey, Yelkur, and O'Brien (the "Appendix"). A true and correct copy of the Appendix is attached hereto as **Exhibit E**

188.    As alleged herein, and incorporated herein by reference, all of the noted procedural violations are breaches of Dr. Lakehal-Ayat's employment contract by the College.

### Post Unanimous Report Delays

189.    Pursuant to Faculty Statute 3.13.7, President Rooney shared the Committee Report with the Board of Trustees on or about October 2, 2018.

190.    Pursuant to Faculty Statute 3.13.7, the Board of Trustees is presumed to accept and adopt the Committee Report. However, if it chooses to consider the facts, then it may do so and must request argument from both sides.

191.    Faculty Statute 3.13.7 states that: "On the assumption that the governing board has accepted the principle of the faculty Hearing Committee, acceptance of the Committee's decision would normally be expected. If the governing body chooses to review the case, its review should be based on the record of the previous hearing,

accompanied by opportunity for argument, oral or written or both, by the principals at the hearing of their representatives."

192.   The College then further delayed this matter.

193.   On three occasions, Plaintiff sought an update and timeline from the College regarding Board of Trustees' action on the Committee Report. The College would not provide a response or did not have one to provide.

194.   Only later, on or about November 5, 2018, the Board of Trustees requested additional arguments in support or opposition of the unanimous decision. Those submissions were made on November 19, 2018.

195.   As of the date of this Complaint, there has been no further communication from the College.

196.   Dr. Lakehal-Ayat remains suspended.

197.   These numerous unwarranted delays are further violations and breaches of contract.

## CLAIMS

### FIRST CLAIM FOR RELIEF
(Discrimination)

198.   Plaintiff repeats and realleges as though fully set forth herein, all allegations in the preceding paragraphs.

199.   Plaintiff was subjected to discrimination by Defendants based on his national origin, religion, and age.

200.   Plaintiff was also subjected to a hostile work environment condoned by St. John Fisher College.

201.    The conduct of Defendants was outrageous and done in conscious disregard of Plaintiff's rights.

202.    Therefore, Plaintiff is entitled to relief as provided under Title VII, including, but not limited to, equitable and injunctive relief, punitive damages, expenses and attorneys' fees in an amount to be determined at trial.

203.    Plaintiff is also entitled to relief as provided under New York Human Rights Law Sections 290, et seq., including section 296, including, but not limited to, equitable and injunctive relief, punitive damages, expenses and attorneys' fees in an amount to be determined at trial.

204.    Defendants' conduct, particularly Defendant Yelkur, was and continues to be outrageous, was done in a deliberate, callous, malicious, fraudulent, and oppressive manner intended to injure Plaintiff; was done with an improper and evil motive, amount to malice and spite; and was done in conscious disregard of Plaintiff's rights. Plaintiff is therefore also entitled to an award of punitive damages under federal and state law.

## SECOND CLAIM FOR RELIEF
### (Retaliation)

205.    Plaintiff repeats and realleges as though fully set forth herein, all allegations in the preceding paragraphs.

206.    Plaintiff made good faith complaints to Defendants about the direct discrimination against him and the hostile work environment.

207.    All Defendants had knowledge of Plaintiff's activities and the adverse treatment he suffered as a consequence of such activities.

29

208.    As a proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer impairment and damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

209.    Dr. Lakehal-Ayat complained of the illegal discrimination and retaliation to the College. Because of those complaints, the College, the President, and the College representatives further retaliated against Plaintiff by seeking to have the College's Rank and Tenure Committee recommend that Plaintiff be terminated.

210.    As a result of the foregoing, Dr. Lakehal-Ayat has lost promotional opportunities, bonuses, and raises; has suffered mental anguish, emotional distress, and loss of enjoyment of life; and has incurred damaged thereby.

211.    Therefore, Plaintiff is entitled to relief as provided under Title VII, including, but not limited to, equitable and injunctive relief, punitive damages, expenses and attorneys' fees in an amount to be determined at trial.

212.    Plaintiff is also entitled to relief as provided under New York Human Rights Law sections 290, et seq., including section 296, including, but not limited to, equitable and injunctive relief, punitive damages, expenses and attorneys' fees in an amount to be determined at trial.

213.    Defendants' conduct, particularly Defendants Rooney, Railey, and Yelkur was and continues to be outrageous, was done in a deliberate, callous, malicious, fraudulent, and oppressive manner intended to injure Plaintiff; was done with an improper and evil motive, amount to malice and spite; and was done in conscious

disregard of Plaintiff's rights. Plaintiff is therefore also entitled to an award of punitive damages.

### THIRD CLAIM FOR RELIEF
(Breach of Contract)

214.    Plaintiff repeats and realleges as though fully set forth herein, all allegations in the preceding paragraphs.

215.    A valid and enforceable employment contract exists between Plaintiff and the College.

216.    That employment contract, by express language in the Tenure Letters, provides that the College's Faculty Statutes are terms of the employment contract.

217.    The employment contract set Plaintiff's compensation each year.

218.    Under the employment contract, Plaintiff was also entitled to earn additional income if he taught additional courses.

219.    At all relevant times, Plaintiff complied with his obligations under the employment contract.

220.    All Defendants breached the employment contract as described in this complaint.

221.    Faculty Statute 3.13.3 (the "Suspension Statute") states: "Suspension of the faculty member during the proceedings involving him/her is justified only if immediate harm to himself/herself or others is threatened by his continuance. Unless legal considerations forbid, any such suspension should be with pay."

222.    The College, the Board of Trustees, President, and Provost breached the Suspension Statute by suspending Plaintiff absent "an immediate harm to himself or others or is threatened by his continuance."

223.    Faculty Statute 3.13.1 (the "Due Process Statute") states: "When reason arises to question the fitness of a college or university faculty member who has tenure or whose term appointment has not expired, the appropriate administrative officers should ordinarily discuss the matter with him/her in personal confidence. The Rank and Tenure Committee elected by the faculty and charged with the function of rendering confidential advice in such situations should informally inquire into the situation, to effect an adjustment if possible and, if none if effected, to determine whether in its view formal proceedings to consider his/her dismissal should be instituted. "

224.    The College, President, Provost, Dean, and Chair breached the Due Process Statute by interfering with the Rank and Tenure Committee informal proceeding, as described in this complaint.

225.    All Defendants further breached the Due Process Statute by:

   a. The President was to remain neutral, but submitted a report indicating his preference of Plaintiff's termination, violating the statutes.

   b. The Provost was to recuse himself from the Rank and Tenure Committee informal proceeding, but refused to do so when requested by the Rank and Tenure Committee, including its Chair; all in violation of the statute.

   c. Plaintiff was denied Due Process throughout the academic due process investigation.

226.    Faculty Statute 3.13.5 (the "Dismissal Hearing Statute") states that: "The Committee, in consultation with the President and the faculty member, should exercise its judgment as to whether the hearing should be public or private. If any facts are in dispute,

the testimony of witnesses and other evidence concerning the matter set forth in the

President's letter to the faculty member should be received. The President should have

the option of attendance during the hearing. He/She may designate an appropriate

representative to assist in developing the case; but the Committee should determine the

order of proof, should normally conduct questioning of the witnesses, and if necessary,

should secure the presentation of evidence important to the case. The faculty member or

his/her counsel and the representative designated by the President should have the right,

within reasonable limits, to question all witnesses who testify orally. The faculty member

should have the opportunity to be confronted by all witnesses adverse to him/her."

227. All Defendants breached the Dismissal Hearing Statute by:

    a. Refusing to permit the hearing to be completely public;

    b. Refusing to allow Plaintiff's legal counsel to question the witnesses presented at the hearing;

    c. Refusing to secure the presentation of evidence at the Hearing important to the case, including, without limitation:

        i. written evidence by a former student who requested a grade enhancement for assisting the College with getting rid of Dr. Lakehal-Ayat; and

        ii. record evidence of another student's character and integrity flaws, demonstrated by his on campus behavior resulting in an order of protection.

    d. Refusing to provide Plaintiff the opportunity at the Hearing to confront witnesses adverse to him, including without limitation, President Rooney, who refused to testify in the Hearing;

228. Faculty Statute 3.15.3 (the "Informal Grievance Statute") states that: "A

faculty member who believes that he or she has a grievance should first make a good

faith effort to resolve the matter with the appropriate party or parties, enlisting the aid of

mediating persons as appropriate. If this is unsuccessful, the grievant should discuss the situation with the School Dean. If the grievance is directed at the School Dean, the grievant should discuss the situation with the Provost. If the grievance is directed at the Provost the grievant should discuss the situation with the President."

229. Faculty Statute 3.13.5 (the "Grievance Procedures Statute") states that: "In all cases, the formal procedures of this Part 3.13.5 are available only for grievances which assert that there was a breach, misinterpretation or misapplication of the procedures involved in arriving at a decision, or that bias, conflict of interest, or other prejudice materially tainted the decision. Parties wishing to bring a formal grievance must notify the President and the Chair of the Grievance Committee within one month.

230. The College, Provost, and President breached the Grievance Statutes by:

a. The Provost informed the Grievance Committee not to investigate Plaintiff's Grievance, which delayed the Grievance.

b. The College incorrectly denied the first Grievance as untimely.

c. The President refused to mediate a second Grievance because he falsely blamed the Board of Trustees, not the Provost, for suspending Plaintiff; stating that no grievance may be filed for Board of Trustee actions.

231. The Board of Trustees breached and continues to breach the Due Process Statute by failing to act on the Unanimous Report by the Ad Hoc Committee

## DEMAND FOR JURY TRIAL

232. Plaintiff hereby demands a jury trial.

**WHEREFORE**, as a result of the discriminatory conduct and all actions of the Defendants herein alleged, Plaintiff demands:

(1) Judgment declaring that Defendants violated the relevant laws;

34

(2) Defendants, their agents, employees, officers and successors in interest, and those acting in concert with Defendants, be permanently enjoyed from engaging in the future in the wrongful practices alleged herein;

(3) An Award of Plaintiff's actual damages in an amount to be determined at trial, for loss of wages, benefits, pecuniary opportunities, and promotional opportunities, including an award of front-pay, back-pay, compensation for loss of future salary and benefits; plus an award of punitive damages on all claims;

(4) An award of damages in an amount to be determined at trial, to compensate Plaintiff for mental anguish, humiliation, embarrassment, professional reputation injury, and emotional injury;

(5) That Plaintiff be made whole in the form of back pay and front pay and afforded all benefits which would have been afforded Plaintiff but for said discrimination;

(6) Defendants be ordered to pay Plaintiff prejudgment interest;

(7) Defendants be ordered to pay the costs and disbursements of this action, including attorneys' fees;

(8) The total damages award is to be determined at trial, but in no event should it be less than $1,000,000.00; and

(9) Such other and further relief as this Court deems proper.

Dated:     December 17, 2018
           Rochester, New York

**THE GLENNON LAW FIRM, P.C.**

Peter J. Glennon, Esq.
*Attorney for Plaintiff*
160 Linden Oaks
Rochester, NY 14625
Telephone: (585) 210-2150
PGlennon@GlennonLawFirm.com

35