# EXHIBIT A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Buffalo Local Office

300 Pearl Street, Suite 450
Buffalo, NY 14202
(716) 431-5007
FAX (716) 551-4387

Merouane Lakehal-Ayat
15 Wood Lily Lane
Fairport, NY 14450

Re:   EEOC Charge No.: 525-2018-01060
      Lakehal-Ayat v. St. John Fisher College

Dear Dr. Lakehal-Ayat:

The Equal Employment Opportunity Commission (hereinafter referred to as the "Commission"), has reviewed the above-referenced charge according to our charge prioritization procedures. These procedures, which are based on a reallocation of the Commission's staff resources, apply to all open charges in our inventory and call for us to focus our limited resources on those cases that are most likely to result in findings of violations of the laws we enforce.

In accordance with these procedures, we have evaluated your charge based upon the information and evidence submitted. You allege you were discriminated against and suspended based on your national origin, religion, age and in retaliation for complaining about discrimination.

Respondent provided a non-discriminatory reason for it actions, stating you were suspended and it is seeking your dismissal because you were secretly using unqualified, undergraduate students to perform your grading, exam preparation, lesson planning, and other teaching-related duties that were your responsibility. The evidence showed students made a complaint to the administration regarding these practices. Students provided evidence to support their complaint. Respondent further stated that you attempted to interfere with its investigation by asking students to keep quiet, delete electronic records, and shred paper evidence. Respondent alleges you then retaliated against and threatened former student assistants who reported this conduct to the administration. There is no evidence of a discriminatory animus. Based upon an analysis of the information submitted to us, the Commission is unable to conclude that the information establishes a violation of Federal law on the part of Respondent. This does not certify that Respondent is in compliance with the statutes. No finding is made as to any other issue that might be construed as having been raised by this charge.

The Commission's processing of this charge has been concluded. Included with this letter is your Notice of Dismissal and Right to Sue. Following this dismissal, you may only pursue this matter by filing suit against the Respondent named in the charge within 90 days of receipt of said notice. Otherwise, your right to sue will be lost. Please contact Lead Systemic Investigator Jennifer A. Carlo at (716) 431-5012 if you have any questions.

Sincerely,

Date: SEP 2 4 2018

_____ for
John B. Thompson, Jr., Director
Buffalo Local Office

cc:   Peter J. Glennon
      The Glennon Law Firm P.C.
      160 Linden Oaks
      Rochester, NY 14625

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Merouane Lakehal-Ayat<br>Wood Lily Lane<br>Fairport, NY 14450 | From: Buffalo Local Office<br>300 Pearl Street<br>Suite 450<br>Buffalo, NY 14202 |
|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **525-2018-01060** | Jennifer Carlo,<br>**Lead Systemic Investigator** | **(716) 431-5012** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

| | On behalf of the Commission | |
|---|---|---|
| Enclosures(s) | *John E. Thompson Jr.*<br>**John E. Thompson,**<br>**Local Office Director** | SEP 2 4 2018<br>(Date Mailed) |

cc:  **ST. JOHN FISHER COLLEGE**
c/o Marion Blankopf
**NIXON PEABODY LLP**
**1300 Clinton Square**
Rochester, NY 14604

Peter J. Glennon
**THE GLENNON LAW FIRM P.C.**
**160 Linden Oaks**
Rochester, NY 14625

# EXHIBIT B

St John Fisher College
Student Employment Program
Job Description Form
Academic Year

Payroll Department
Kearney Admin Bldg, K-217
Phone: (585) 385-8057
Fax: (585) 385-8438
e-mail: mpowley@sjfc.edu

This job description form is used to record the job title, the job duties and addition information regarding a student position that you would like to offer in your area. This information is used to determine if a position qualifies as a Federal work study or a Community Service position as defined under Federal guidelines or as a College non-work study position. A position can not be filled until an approved job description is on file in the Payroll Department.

A Student Job Description Form needs to be on file in the Payroll Department for **each position,** not each student.

Department: Accounting and Finance

Job Location: Appropriate faculty members office-see below

Job Title: Faculty Assistant

**Supervisor:** This person must be present at the work site when the student is working. He/she is also the person who regulates & submits hours worked and ensures that the student employee is performing his/her duties properly.

Supervisor's Name: Mike Fedoryshyn      K410   x8091
Art Hintz                                 K406   x8248
Tom Tyson                                 K408   x8431
Karyl Mammano                             K414   x7339
Kari Smoker                               K408   x7220
Merouane Lakehal-Ayat                     K409   x8429
Ed Stendardi                              K301D  x8093
Farrokh Mamaghani                         K301A  x8437
Iran Safdar                               Phar. 308

Supervisor's Job Title: Assistant, Associate or Professor of Accounting

Office Phone Number: 385-8091        SJFC E-mail: mfedoryshyn@sjfc.edu

Please 'X' type of work:

| | | |
|---|---|---|
| X  Administrative | ____Golf Course Attendant | X   Office/Clerical |
| ____Athletics – Desk Coverage | ____Grounds | ____Research Assistant |
| ____Athletics – Special Events | ____Information Technology | ____Residential Life |
| ____Athletics – Intramurals | ____Lab Assistant | ____Tutor – Academic Affairs |
| ____Child Care | ____Library Assistant | ____Tutor – Academic Departments |
| ____Dispatcher | ____Library Shelver/Systems | ____Tutor – Special Needs |
| X  Educational Assistant | ____Maintenance | ____Tour Guide |
| ____Other (please explain): _____ | | |

Job Description - Please list the position's duties and responsibilities:

Assist faculty members in a variety of responsibilities including preparing and grading quizzes and other assignments, recording grades, assisting in preparing various assessment reports. Students will also assist the faculty member in a variety of responsibilities related to internships, preparation for on-campus events and other administrative functions. On occasion the student will represent the department at various on-campus open houses and off-campus professional meetings.

Please list job qualifications:

Major in accounting or Finance.

Educational Benefits - Please list experience gained that will complement the student's academic program or career goals (required for all Federal Work Study job listings):

**Students have the opportunity to interact with the faculty members, reinforce the learning from previous courses in accounting and finance and network with members of the local accounting and finance professional communities.**

Additional Information:
Please answer ('X') the following questions as they pertain to this job.

1) This is a tutoring position. _____ Yes   X   No

    If yes: what age group? _____ pre-school _____ grades K-6 _____ grades 7-12 _____ college students

        what subject(s)? _____ Reading _____ Math _____ Literacy project

2) This position provides a service(s) **to the college and/or the local community,** improving the quality of life.
    _____ Yes   X   No

    If yes, please check applicable service(s) provided:
    _____ Child Care
    _____ Public safety or crime prevention and control
    _____ Health Care
    _____ Welfare, social services
    _____ Work in service opportunities
    _____ Transportation, housing, or neighborhood improvement
    _____ Support services for students with disabilities
    _____ Mentor for such purposes as supporting educational and recreational activities, or counseling

3) Please check any duties and/or responsibilities that apply to this position:

    X   Handling financial, student or personnel data or records?
    X   Handling confidential or sensitive data or information?
    _____ Handling cash, checks, or credit card transactions?
    _____ Responsibilities for/or providing services to anyone under the age of 18?
    _____ Processing keys/codes or other means of entry to living spaces within college housing?
    _____ Access to select agent, toxins or hazardous materials as defined by the Centers for Disease Control?
    _____ Does this position require the employee to drive a vehicle or transport others?
    If yes, a Motor Vehicle Records Check is required. The student needs to provide a copy of his/her license to the Director of Payroll Services.

Submitted by: Michael Fedoryshyn
        (Print Name)

Signature:_____   Date:_____

---

PAYROLL DEPARTMENT USE ONLY:
Date Submitted: _____
Job Description is complete as submitted? _____ Yes _____ No
    If "No" what are the issues. Attach a copy of the e-mail that was sent to the supervisor indicating corrections to be made.
    ISSUES: _____

_____

_____

Job Description Approval Date: _____

Payroll Department Authorization: _____

# EXHIBIT C

# Guide for Undergraduate Teaching Assistantships



**Undergraduate Programs and Policies Committee Members**
**2011-2012**

Chair - Joy Hendrick - SUNY Cortland
Sunil Labroo - SUNY Oneonta
Daniel Smith - University at Albany
Joe Marren - Buffalo State College
Runi Mukherji - SUNY Old Westbury
Jim McElwaine - SUNY Purchase
Timothy Tryjankowski - University at Buffalo
Terry Hamblin - SUNY Delhi
Nancy Willie-Schiff - System Administration Liaison
Linnea LoPresti - System Administration Liaison
Art Lundahl - Suffolk Community College

*2012*

**Introduction:**

To promote best practices on SUNY campuses, the Undergraduate Policies & Programs Committee of the University Faculty Senate suggests these recommendations when considering campus policies related to undergraduate teaching assistantships.

**Definition:**

An undergraduate Teaching Assistant (TA) is a student enrolled in a credit-bearing course with specific student learning outcomes to assist faculty in providing instructional support.  Credit is awarded according to SUNY policy for credit-contact hours, which is found at
.

**Recommendations:**

A Teaching Assistantship can have many benefits to the student, the faculty mentor, and other students enrolled in the class.

For the TA, it can lead to:
- better understanding of the teaching and learning process
- deeper appreciation of the subject matter
- pre-professional training
- improvement of writing and presentation skills
- development of leadership and self-confidence
- better time management skills

For the faculty mentor, the TA can provide formative feedback on course assignments, course content and delivery, and how well the students in the course are learning.  Students enrolled in the course can benefit from access to a peer mentor which can lead to increased engagement through greater time spent in out-of-class learning activities facilitated by the TA.

Seven aspects of good practice for undergraduate teaching assistantships have been identified by Roderick (2009) based on a review of the literature and her own research.  She reported that good practice...

1. Facilitates a transparent selection process,
2. Negotiates responsibilities of assistantships,
3. Trains and mentors undergraduate teaching assistants,
4. Provides teaching assistants with visibility and opportunities to display competence,
5. Engages teaching assistants in the course and in student learning,
6. Enhances educational quality for all, and
7. Encourages fair compensation.

There are a number of ethical and pedagogical issues that must be carefully considered however when campuses and faculty decide to utilize undergraduate students as TAs. Realizing that different disciplines have different needs and expectations for a TA-ship, we propose the following general recommendations for the development of campus policies.

## 1. The Selection Process:

Campus policies should encourage the Campus and /or individual departments to establish a transparent selection process for TAs with clearly stated criteria. These criteria may include:

- junior or senior class standing
- outstanding overall academic performance as demonstrated by GPA
- recent performance in the course (this should not be the sole criterion)
- familiarity and competence with the subject matter
- written and verbal proficiency
- relevant teaching/mentoring experience
- interpersonal and rapport-building skills
- self-directedness
- ability to set reasonable goals and priorities
- ability to cope with stress
- ability to articulate a strong motivation to assume a TA position

## 2. TA Responsibilities:

Campus policies should encourage the negotiation of the TA's responsibilities with well established roles in order to maximize the best outcomes for all concerned. For example, the number of hours spent by the TA per week in accordance with the SUNY credit-contact hour policy as listed above, and the resources available to TAs, should be clearly articulated. Campus policies should also clearly indicate the TA's role, if any, in assigning or determining grades in a course.

## 3. Training and Continued Mentorship:

Campus policies should address the ways that TAs are provided with opportunities to understand their responsibilities, and how to work in collaboration with others to discharge these responsibilities. For example, how will TAs receive training in ethical issues they may encounter, and how should they seek assistance in addressing any ethical or code issues that might arise? Such issues may include confidentiality, plagiarism, cheating, and navigating the dual roles of peer and TA. Will training involve a formal workshop and/or regular meetings with the faculty supervisor and/or signing of a written contract of expectations and roles? How will faculty provide regular feedback to TAs about their performance?

**4.  Engagement and Visibility:**

When TAs are engaged in the course in meaningful ways, student learning is enhanced and the TA experience becomes an enriching opportunity.  Engaging TAs develops their skills, furthers their own learning, provides them with a sense of community, and enhances their self-esteem.  Positive outcomes for the entire course occur when TA tasks are well-organized and integrated with the academic content of student learning.  Ways for meaningful engagement can include, but are not limited to:

- leading class discussion or break-out groups
- making presentations
- setting up classroom demonstrations
- leading tutorials, recitations, or labs
- providing feedback on student work, which may include papers, homework, quizzes, exams, and other similar assignments
- hosting focus groups to obtain student feedback on class assignments or activities
- assisting faculty with proctoring exams
- assisting faculty with class attendance

**5.  Supervision:**

Campus policies should emphasize that it is critical for all TA classroom duties to be conducted under direct supervision of the faculty mentor, and the specific limitations of what TAs can and cannot do.  For example, can a TA be left alone in the classroom to perform duties normally performed by the faculty supervisor?  Can a TA be involved in evaluating or correcting papers, homework, exams, and other similar work?  (Note that the final numerical or letter grade for student work should be assigned by the faculty.)

**6.  Assessment:**

The criteria for assessing a TA's performance should be clearly linked with the specific student learning outcomes for the course.  The actual student learning outcomes will likely vary depending on the specific duties and responsibilities that the student will be assigned.  A sample of some possible student learning outcomes appear below.

Undergraduate teaching assistants will demonstrate:
1) thorough understanding of course content and the ability to explain that content effectively to others.
2) an understanding of ethical conduct
3) an understanding of the diversity of student learning styles and associated needs
4) enhanced knowledge and understanding of many aspects involved in college teaching
5) the development of their own teaching philosophy
6) the ability to critically self-reflect in order to enhance their skills and/or performance
7) the ability to facilitate tutorials by leading group discussions

8) the ability to engage students in the learning process
9) the ability to develop effective classroom materials (i.e. PowerPoint presentations, lab experiences, review sheets...)
10) the ability to follow directions and to perform tasks as outlined by the instructor
11) the ability to encourage and support students so that they work to solve the problems themselves
12) the ability to make good judgments
13) critical thinking and problem solving skills
14) effective communication skills
15) effective leadership skills
16) enhanced organization skills
17) effective time-management skills
18) respect for all students and their inclusive communities
19) initiative

Assigning the TA to complete some form of a culminating experience could enhance the academic experience.  Obviously, the type of final project will vary depending on the discipline and the exact responsibilities that the TA will be given.  Final projects however may include the development of new laboratory experience, course review materials, or a series of lesson plans for future TAs to use.  It could also be a self-reflection of his/her teaching in the review sessions, or the creation of PowerPoint presentations or production of a video to assist future students.

Even though the TA will be receiving a grade for the credit-bearing course, it would be extremely beneficial for the student to be given specific written feedback from the faculty member on his/her areas of strength and areas for improvement.  TA-ships are often used as pre-professional development and thus, receiving constructive feedback is critical for enhancing one's teaching skills. If possible, multiple assessments should be scheduled throughout the semester.  Utilizing some form of student/peer assessment would be beneficial for the TA as well.

> *It is the hope of the committee that these recommendations will assist campuses and faculty in the development and delivery of teaching assistantship courses which will allow students a beneficial and worthwhile experience and at the same time assist the faculty member and enhance the classroom experience for everyone.*

**References:**
Roderick, C. (Spring, 2009).  Undergraduate teaching assistantships: Good practices.  *MountainRise, the International Journal of the Scholarship of Teaching and Learning.*

Portions of this document were adopted from the following publication:

# EXHIBIT D

## Introduction

This Report contains the findings, recommendations, and commentary from the Academic Due Process Hearing Committee pursuant President Rooney's Joint Statement of Proposed Grounds for Dismissal of Merouane Lakehal-Ayat,[1] and subsequent hearing. The Committee required clear and convincing evidence from the hearing that was both relevant and probative as a basis for decision. This Report contains an Executive Summary of the findings of the Committee, Background, Detailed Findings, Comments, Conclusions, Dissenting Opinion, and Appendices.

## Executive Summary

As a preliminary matter, the Committee finds troubling the absence of appropriate administrative process at the Department, School, and College level prior to engaging the Academic Due Process hearing apparatus. This resulted in an unnecessary, and undoubtedly enormous, cost borne by the College. To be fair, the adversaries share blame. In the interest of establishing better administrative procedures, this Committee respectfully requests that our Process Recommendations in the Conclusions section are seriously considered for concrete action.

The Joint Statement preferred eight Grounds for dismissal, generally for a

> Protracted failure to discharge a significant portion of the primary responsibilities of a faculty member. (Faculty Statutes 3.6.5.h.iv)

Four of these, #4, 6, 7, and 8 were not justiciable because they did not state a claim that could logically be decided by the Committee. Specifically, isolated behaviors cited in the Grounds could not be "protracted" in any common definition of this pivotal element; there was no suggestion behaviors were long-lasting, drawn out over an extended period, or prolonged in any way. In the absence of facial validity of the Ground, there was no valid claim to decide and these Grounds were dismissed.

The following is a summary of the decisions of the Committee for each paraphrased Ground, discussed in greater detail below.

1. Dr. Lakehal-Ayat delegated his responsibility to grade his exams and class assignments. <u>Recommendation:</u> Dismiss this charge, not a protracted failure to discharge a significant portion of the primary responsibilities of a faculty member.

2. Dr. Lakehal-Ayat delegated his responsibility to prepare exams in his courses. <u>Recommendation:</u> Dismiss this charge, not a protracted failure to discharge a significant portion of the primary responsibilities of a faculty member.

3. Dr. Lakehal-Ayat breached the confidentiality and system security of students' grades and academic records. <u>Recommendation:</u> Dismiss this charge, not a protracted failure to discharge a significant portion of the primary responsibilities of a faculty member.

4. Dr. Lakehal-Ayat had a student post class information and respond to student inquiries using Dr. Lakehal-Ayat's network credentials. <u>Recommendation:</u> Dismiss this charge, not a protracted failure to discharge a significant portion of the primary responsibilities of a faculty member.

---

[1] Letter of President Rooney, April 20th, 2018.

5. Dr. Lakehal-Ayat had students perform the classroom planning, leading, and day-to-day course-related tasks that are the responsibility of the College's teaching faculty. <u>Recommendation:</u> Dismiss this charge, not a protracted failure to discharge a significant portion of the primary responsibilities of a faculty member.

6. Dr. Lakehal-Ayat made unethical and/or inappropriate requests of students. <u>Recommendation:</u> Dismiss this charge, not a protracted failure to discharge a significant portion of the primary responsibilities of a faculty member.

7. When students began to complain about the work he was directing them to perform, Dr. Lakehal-Ayat retaliated against them. <u>Recommendation:</u> Dismiss this charge on this basis, not a protracted failure to discharge a significant portion of the primary responsibilities of a faculty member. However, the Committee requires apology for and retraction of threatening letter.

8. Dr. Lakehal-Ayat destroyed, attempted to destroy, and/or removed evidence pertinent to the investigation of his conduct. <u>Recommendation:</u> Dismiss this charge, not a protracted failure to discharge a significant portion of the primary responsibilities of a faculty member.

The Committee unanimously recommends reinstatement of Dr. Lakehal-Ayat on the express condition of formal apology, and retraction of threat of lawsuit against a student for defamation.

The Committee also recommends significant amendment to policies and procedures (Faculty Statutes, Human Resources, Information Technology, etc.) that would prevent both the individual behavior from reoccurring in the classroom, and the administrative decisions that improperly truncated underlying Department and School process.

# EXHIBIT E

obligations are in conflict, the professional must decide between exercising the legal right and honoring the ethical/moral obligation. In the absence of explanation we can only conclude that Professor Lakehal-Ayat breached his professional ethical obligation by making this threat. While we depart from the majority on the finding for this is an act of moral turpitude, we do join in the recommendation that a formal written apology and retraction (acceptable to the Board) an express condition of Professor Lakehal-Ayat's reinstatement. The dissenting members would add remedial training in professional ethics as an additional condition of reinstatement.

## Appendix[10]

*(During this process of hearing and deliberation, numerous issues came to light that did not directly bear on the Grounds presented in the Joint Statement, but rather have bearing on the administrative process that was undertaken. The Drs. Bowers and Ricca believe that comments on some of these are worthy of further consideration, but did not wish to overly complexify their recommendations. These comments are included here in the intent that they may provide additional insight into the current matter and any related matters that may arise in the future. Additional recommendations regarding possible revisions to the Faculty Statutes will be made to the Faculty Assembly after the conclusion of the Part 13 process).*

During the Committee's reviewing of facts, hearing of testimony, and deliberation on the evidence, a number of troubling aspects of the Administration's actions came to light. Because the process that was undertaken by the Administration contributed to the situation that led to this Committee's work, it is important that an examination of that process be included. The Faculty Statutes state:

> Tenure is a means to a certain end. Specifically, it allows freedom in teaching, research, and in extramural activities, and it provides a sufficient degree of economic security. . . . Tenure protects faculty members from untoward pressures from inside or outside the academic community. . . . Hence, tenure is indispensable to the success of the College in fulfilling its obligation to its students and to society. (Part 10 3.10.1, p. 40)

Thus it is necessary to recognize the essential role tenure plays in the academic community. But tenure is not a guarantee of life-time employment, and there may come the rare occasion where proceeding to revoke tenure and dismiss a faculty is necessary. However, all principals in this matter should also recognizes that a "dismissal proceeding is a symptom of a failure; no amount of use of removal will help strengthen education as much as will the cultivation of conditions in which dismissal rarely if ever occur" (AAUP, *1958 Statement on Procedural Standards in Faculty Dismissal Proceeding*, p. 12). Accordingly, in all such cases it is fundamental that College administrators and involved faculty do not rush to judgement and instead assure that the faculty member under consideration for revocation of tenure and dismissal has been provided opportunity to correct the alleged inappropriate behavior where possible prior to such a termination hearing, and that when such a hearing is necessary that he/she be treated fairly,

---

[10] Drs. Dingus-Eason, Schultz, and Williams do not join in this Appendix. First, this Appendix is unnecessary to the Report. Second, it does not fairly consider the role Professor Lakehal-Ayat played, through his counsel, in the breakdown of administrative process that resulted in the perceived need for this Hearing. For these reasons, we decline to join any part of this Appendix.

without prejudice, and provided full due process. As AAUP has long insisted when such a hearing occurs then the College must be prepared and willing to act in a manner that guarantees that "individual human rights be preserved during the process;" that "faculty must be willing to recommend dismissal of a colleague when necessary"; and that a college president and governing board "be willing to give full weight to a faculty judgment favorable to a colleague" (p. 12).

"The most authoritative source regarding the meaning and purpose of tenure is the American Association of University Professors" (*Barnes v. Washington State Community College Dist. 22*, 529 P,2d 1102 (1975) as noted in *AAUP Policy Documents & Reports, 10th* ed., "Appendix IV," p. 307). So recognized, all involved parties in the case against Dr. Lakehal-Ayat are well-advised to act on and rely upon AAUP principles and guidelines in addition to the Faculty Statutes which are built upon and incorporate those same principles and guidelines. In regard to termination and discipline AAUP is clear:

> Tenure is translatable as a statement of formal assurance that . . . the individual's professional security and academic freedom will not be place in questions without the observance of full academic due process. (AAUP, *Termination & Discipline* 2004, p. 2 quoting *Tenure: A Summary, Explanation, and 'Defense'* AAUP Bulletin 57:329, 1971)

Full academic due process includes both the manner and content of administrative actions prior to commencing formal procedures and the formal proceedings themselves. In regard to the latter, full academic due process is reflected in Part 13 of the Faculty Statutes. Administrative actions prior to formal procedures necessitating variations of full due process are identifiable via Faculty Statutes, written college policies, and "academic custom" (a.k.a. "academic usage," or "academic common law") (AAUP, *Termination & Discipline*, 2004 p.3). Among those administrative actions prior to formal procedures most likely to assure fairness and full due process are the practices of "progressive discipline"; faithful application of statutory provisions; and full, fair, and impartial investigations. In this case, however, there has been substantial failures in progressive discipline, violations of statutory provisions, and a flawed investigation each contributed to greatly exacerbate a situation that could and should have been addressed at the School or even Department level. These errors undermine and threaten the value and meaning of tenure, not only for Dr. Lakehal-Ayat, but for all tenure-track and tenured faculty at St. John Fisher College. Further, these errors call into question the validity of both the suspension and banishment the College imposed on Dr. Lakehal-Ayat and its pursuit of terminating his employment with the College.

**Progressive Discipline**

According to the evidence/testimony presented, at no time was any outcome considered other than the separation of Dr. Lakehal-Ayat from the College. This represents a failure to engage in "progressive discipline" (e.g., remediation, conditions placed on the faculty member, etc.), which is not only recommended by the AAUP, but also is reflective of best business practices. Instead, a first meeting told Dr. Lakehal-Ayat to restrict his contact with students, and after a brief (and flawed) investigation, a second meeting resulted in his suspension, physical banishment from campus, and removal of access to his St. John Fisher College email. In short, Dr. Lakehal-Ayat's suspension was effectively a termination with pay.

Suspension is a "severe sanction, second only to dismissal" (AAUP, *The Use and Abuse of Faculty Suspensions*, 2008). The severity of suspension as a disciplinary action, particularly as the primary sanction, is highlighted by an acknowledgement made 52 years ago that remains relevant today:

> The Profession's entire case for academic freedom and its attendant standards is predicated upon the basic right to employ one's profession skills in practice, a right, in the case of the teaching profession, which is exercised not in private practice but through institutions. To deny a faculty member this opportunity without adequate cause, regardless of monetary compensation, is to deny him[/her] his[/her]basic professional rights. Moreover, to a good teacher, to be involuntarily idle is a serious harm in itself. (Academic Freedom and Tenure: St. John University (New York), *AAUP Bulletin 52*, Spring 1966, pp. 18-19)

AAUP directly and the Faculty Statutes indirectly through their reliance on and inclusion of AAUP language and standards, articulate that suspending a faculty member, even with pay, should be an act of last resort and should be employed only after less serious sanctions have been tried and have failed to correct the behavior and performance resulting in disciplinary action. In lieu of suspensions and termination AAUP recommends that in order "to restore the faculty member to his [/her] former competence" "progressive discipline" be applied prior to the more severe sanctions such as suspension and dismissal (AAUP, *Termination & Discipline*, 2004 pp. 7, & 12-13). Specifically, AAUP recommends:

> [T]hat each institution develop and adopt an enumeration of sanctions short of dismissal that be applied in cases of demonstrated irresponsibility or professional misconduct for which penalty short of dismissal should be imposed. These sanctions and due-process procedures for complaint, hearing, judgement, and appeal should be developed initially by joint faculty-administrative action.

Among the "minor sanctions," AAUP encourages prior to suspension and dismissal are such actions as oral reprimand, written reprimand, a recorded reprimand, loss of prospective benefits for a specified period of time, and a reduction in salary for a stated period of time. There is no evidence that any of these were considered.

For College employees, the Employee Handbook employs a principle of progressive discipline, stating:

> Disciplinary action can take one of several forms, including but not limited to verbal warnings, written warning, or termination, depending upon the nature and severity of the employee's conduct, the employee's prior record, and other relevant facts and circumstances. (D3)

The testimony of Dr. O'Brien documents that at no time did she either seek to propose some form of correct action i.e. progressive discipline to address Dr. Lakehal-Ayat's alleged inappropriate behavior or that she talked to him one-on-one as his Chair to present the student charges against him or seek his explanation of them. To the contrary when asked "what did you do about the information students gave to you" she answered:

> I didn't know what to do, what the process was. I had not had any experience. So first I contacted the dean to ask what I should do with this. She immediately

contacted the provost [sic], and he immediately had us go over to his office. (Internal Hearing Transcript, p. 452, lines 6-10)

She further notes that the first time she met with Dr. Lakehal-Ayat was in a November 14, 2017 meeting in the Provost's office with the Dean, Provost, and Vice President of Human Resources also attending (Internal Hearing Transcript, p. 453, lines 14-17). Further in her testimony, Dr. O'Brien again confirms she never met one-on-one with Dr. Lakehal-Ayat (Internal Hearing Transcript, p. 457, lines 11-13). Later in her testimony, Dr. O'Brien notes that after a November 27 meeting again the Provost's Office that Dr. Lakehal-Ayat asks her directly why she never spoke directly to him about the student complaints. In her testimony, she recalls telling him "that at this point it wasn't about me coming to him" (Internal Hearing Transcript, p. 462, lines 11-15).

Even if excused as inexperience in being a department chair, Dr. O'Brien's behavior in not speaking directly one-on-one with Dr. Lakehal-Ayat as Fisher's academic customs and practices (supported by the statutory language cited previously) prescribe chairs to do, indicates a failure to execute the supervisory responsibilities inherent in her administrative position as department chair. This failure is further compounded by two other acknowledgements that Dr. O'Brien makes in her testimony. The first is that along with not speaking one-on-one with Dr. Lakehal-Ayat, she refused to or failed to follow up on interviewing students with which he requested her to speak regarding the charges against him (See Internal Hearing Transcript, p. 479, lines 12-20). These were students supportive of Dr. Lakehal-Ayat and his pedagogical approach to teaching and learning. Second, Dr. O'Brien, despite never addressing the issues one-on-one with Dr, Lakehal-Ayat, or proposing some corrective action, did acknowledge speaking one-on-one to him about retiring:

> I personally did talk to Merouane about maybe this was a great time for retirement. . . . I'm not sure if the school made an offer or not, but I did speak to him about it. (Internal Hearing Transcript, p. 480, lines 11-16)

Dr. Yelkur's testimony further underscores College principals' failure to apply the College's academic customs and practices and seek progressive discipline. First, she acknowledges that she did not meet with Dr. Lakehal-Ayat prior to the Provost becoming involved (Internal Hearing Transcript, p. 92, lines 20-22). Second, Dr. Yelkur further acknowledges that she took no independent corrective action once she learned of the student complaints. When asked to clarify whether she did anything to correct or remediate Dr. Lakehal-Ayat's alleged inappropriate behavior, she notes: "No, I thought it was serious enough that Provost Kevin Railey should be informed immediately and took the matter to him" (Internal Hearing Transcript, p. 98, lines 14-16). Rather than to recommend remediation and corrective action, she reports instead that she agreed with the conclusion to suspend Dr. Lakehal-Ayat (Internal Hearing Transcript, p. 97, line 16). Later in her testimony, Dr. Yelkur further acknowledges not providing Dr. O'Brien any guidance for her in her role as department chair: "It was just the same day. We went to the Dr. Railey the same day, like within hours" (Internal Hearing Transcript, p. 102-103, lines 23-25, and 1-2).

Dr. Yelkur's testimony also reflects a rush to judgment; both Drs. O'Brien and Yelkur accepted without question or investigation the veracity of the students making the complaints and did so by their own admission without ever speaking independently to Dr. Lakehal-Ayat. That Dr. Yelkur chose not to provide Dr. O'Brien with any advice on how to address the matter first at the department level, is difficult to excuse. Her administrative experience also raises the questions as

to why she was so quick to bring this to the Provost's attention; as an administrator she should have exhausted department and school level administrative actions and remedies before escalating the matter.

Failure to consider progressive discipline did not stop at the School level, however. Dr. Railey's testimony extends the failure to pursue progressive discipline. His actions led to suspension and banishment rather than corrective action to restore Dr. Lakehal-Ayat to his "former competence." Dr. Railey's testimony also shows that Dr. Railey substituted his own values and belief system for Faculty Statutes and the College's academic customs and practices. Specifically, Dr. Railey notes: "I felt the accusations were quite extreme and contrary to . . . who I am as a professor" (Internal Hearing Transcript, p. 27, lines 3-7). He also testified that the inappropriate behavior Dr. Lakehal-Ayat allegedly committed "were a direct violation of an implicit oath that all of us carry with us every single day" (Internal Hearing Transcript, p. 77, lines 10-14). It may be true that all teachers have an implicit contract with their students, as noted above, the implementation of that implicit contract will vary greatly across campus, and so a single person's view about the nature of the teacher-student relationship cannot suffice for important matters such as the one under consideration here. Nevertheless, Dr. Railey was unable to state a specific written College policy that Dr. Lakehal-Ayat was alleged to have violated as it related to teaching or use of work-study students. Further, Dr. Railey, though he does not specifically employ the word "retirement" in his testimony does allude to it and also pairs it with the threat to go forward with formal proceeding (See (Internal Hearing Transcript, p. 33 lines 6-15). Specifically, Dr. Railey notes that he indicated that he informed Dr. Lakehal-Ayat that if the professor wanted to take an "another option" other than formal proceeding that "we would be potentially open to that" (lines 11-12). The Provost also alluded to "retirement as an "informal route" (line 14).

Additionally, Ms. Skrainar, the Assistant Vice President of Human Resources, did not propose remediation. On two occasions, Ms. Skrainar was asked if she offered "any steps to remediate the situation" at hand. Both times she replied no. In her second response, Ms Skrainar noted: "No, it was not my role to do that. I was the investigator" (Internal Hearing Transcript, p. 159 lines 5-6; See also p. 158, lines 7-17).

The review of the testimonies offered by Drs. O'Brien, Yelkur, and Railey, and Ms. Skrainar, tell a story of a protracted failure at each level - Department, School, and College - to remediate or correct alleged inappropriate behavior with progressive discipline. Whether the result of inexperience, other personal or professional motivations, or the substitution of a personal belief system for Faculty Statutes, College policies, or customary practice, or any other reason, these four College principals proceeded down a road of pursuing only the suspension and banishment of Dr. Lakehal-Ayat as a prelude to separation.

**Violations of Faculty Statutes**

Two violations of the Faculty Statutes took place during the process of the matter under consideration: suspension before the beginning of proceedings and without "immediate harm" (3.13.3) being in evidence, and a failure to follow the Academic Due Process (3.13.1, 2nd paragraph).

Section 3.13.3 of the Faculty Statutes states:

> SUSPENSION OF THE FACULTY MEMBER. Suspension of the faculty
> member *during the proceedings* involving him/her is justified only if immediate
> harm to himself/herself or others is threatened by his continuance. Unless legal
> considerations forbid, any such suspension should be with pay. (emphasis added)

Dr. Lakehal-Ayat was suspended well before the proceedings began, in violation of this statute. Furthermore, no evidence was presented that allowing Dr. Lakehal-Ayat to continue in his position would have resulted in "immediate harm" to himself or others.

The term immediate harm can be an elusive one, particularly when an administrator is motivated to provide it a "very broad interpretation" (AAUP, "The Use and Abuse of Faculty Suspension," 2008) to justify and otherwise unjustifiable suspension. Despite its potential illusiveness, there is a generally agreed upon understanding of the term, and that is an immediate risk of physical harm. As AAUP writes: "The large majority of AAUP's published case reports seem to concur with the point that 'harm' is meant to be understood as physical" (AAUP, *The Use and Abuse of Faculty Suspension*, 2008). Also, of importance here is the understanding that the word "others" refers to people, not things such as institutions. As AAUP observes: "[O]thers" refer to people and not to institutional reputation, the general good of the institution, or fears of hypothetical development such as fear of litigation". (AAUP, *The Use and Abuse of Faculty Suspension*, 2008)

The record via his own testimony documents that Dr. Railey both misapplied the meaning of "immediate harm" and "other" in now justifying his suspension of Dr. Lakehal-Ayat. Dr. Railey's testimony provides no evidence that Dr. Lakehal-Ayat presented an immediate physical harm to himself or anyone else. Nor is there any evidence that Dr. Lakehal-Ayat was informed that he was being suspended because he presented and immediate harm to himself or others. No evidence of any type was provided to the Committee that Dr. Lakehal-Ayat's continued presence in the classroom or on campus presented and immediate harm to himself or any other person. Instead, testimony establishes that Dr. Railey suspended Dr. Lakehal-Ayat primarily because of his belief that Dr. Lakehal-Ayat represented a reputational threat to the College, a justification in direct opposition to AAUP's recognition that "others" does not extend to the institution itself, its reputation, or its general good (AAUP "The Use and Abuse of Faculty Suspension," 2008). For instance, the early in his testimony Dr. Railey begins to equate his mission in this matter as that of being a "protector," as someone who needed to save the faculty, students, and College from Dr. Lakehal-Ayat:

> And my responsibilities began to be protecting the entire faculty as well as our
> students and educational mission that we deliver, because it's very—these are
> very serious allegations. (Internal Hearing Transcript, p. 32, lines 6-10)

Later in his testimony, Dr. Railey, begins to connect his already assigned guilt to Dr. Lakehal-Ayat with the College's reputation suggesting how it was manifesting itself into his principle motivation for suspending and banishing Dr, Lakehal-Ayat:

> I mean what would it look like if word got out that professors at St. John Fisher
> College are not grading their students' exams, are not preparing their classes . . . .
> If that got out, it would be horrific. (Internal Hearing Transcript, p. 35 line 25, p.
> 36 lines 2-7)

Still further into his testimony, Dr. Railey specifically invokes the reputation of St. John Fisher as an "immediate threat" justifying his suspension of Dr. Lakehal-Ayat:

> There was an immediate threat . . . to the reputation of St. John Fisher College . . . if these kinds of behaviors were talked about widely across campus". (Internal Hearing Transcript, p. 56, line 22-25, p. 57 line 2-4)

In suspending and banishing Dr. Lakehal-Ayat the record also shows that the Provost acted unilaterally and without prior consultation with an appropriate faculty committee charged handling issues of academic freedom and tenure:

> [B]efore an administration suspends a faculty member, it should consult with an appropriate faculty committee charged with handling issues of academic freedom and tenure "as to the propriety, the length, and other conditions of the suspension. (AAUP, *The Use and Abuse of Faculty Suspensions*, 2008)

At the College, the relevant committee is the Committee on Rank and Tenure. Admittedly, the Faculty Statutes do not specifically require this consultation. However, it is implied in that the Statutes embrace AAUP principles and guidelines. The record does show he presented the possibility that a case concerning academic fitness of a faculty member may come before it, but in this meeting the record also indicates that he did not seek consultation from the Rank and Tenure (Internal Hearing Transcript, p. 40, lines 6-16). In fact, the record shows he sought no consultation from the Rank and Tenure prior to suspending and banishing Dr. Lakehal-Ayat. Dr. Railey's action in unilaterally suspending Dr. Lakehal-Ayat is in conflict with this recommended AAUP administrative practice. In so being, Dr. Railey actions are reflective of the conclusion AAUP has made after reviewing numerous faculty suspension:

> Whether a suspension is partial or total, whether or not it is accompanied by exclusion or banishment from the campus, in many cases administrations, often acting only on the advice of their legal counsel, do not seem or care, to grasp the severe effects that suspension can have, not only on the reputation—morale—of an accused faculty member, but also his or her to contest intended sanctions. (AAUP, *The Use and Abuse of Faculty Suspensions*, 2008)

The evidence makes clear that Dr. Railey explicitly violated the Faculty Statutes in suspending Dr. Lakehal-Ayat. The record further allows for the conclusion that had the Provost pursued a course of remediation and corrective action i.e. progressive discipline, Dr. Lakehal-Ayat could have been retained in the classroom and on campus and would not have created an immediate harm, particularly as the term is regularly used and applied.

The St. John Fisher College Employee Handbook mentions suspension of an employee for issues of workplace safety, violation of workplace conduct (D3), or violation of the conflict of interest policies. Of these issues, only the second one - workplace conduct - may have any bearing on the issue under consideration. Section D3 of the Employee Handbook lists 17 specific offenses that fall within workplace conduct; it is unclear that any of them apply to the current situation. (One of them, "Refusing a reasonable request from management" may be claimed to apply, but the evidence presented did not show any reasonable requests that were made of Dr. Lakehal-Ayat).

Additionally, the AAUP notes that suspension "should not be imposed until after a hearing in which the same procedures apply as in a dismissal case" (AAUP, *Termination & Discipline*, 2004, p. 13). Indeed, "suspension without a hearing. . . is tantamount to dismissal."

AAUP further comments on the actions that were taken beyond suspension, namely, the denial of Dr. Lakehal-Ayat's access to his email and his office:

> When the effect of suspension is not only to remove the faculty member from teaching duties but also to deny him or her access to the material needed to prove the charges are groundless and wrongful, such a practice is doubly intolerable. (AAUP, *The Use & Abuse of Faculty Suspensions*, 2008)

Hence, the suspension of Dr. Lakehal-Ayat as unwarranted, and in violation of both Faculty Statutes and the Employee Handbook.

The second paragraph of section 3.31.1 of the Faculty Statutes states:

> If a member of the Rank and Tenure Committee is involved as one of the principals in a case, that person shall not sit on the Committee when it investigates that case.

Section 3.3A.5c of the Faculty Statutes explicitly lists the Provost as a member of the Rank and Tenure Committee. Hence, the attendance of the Dr. Railey when this case was considered by the Rank and Tenure Committee is a violation of the Statutes as well.

Because of the unwarranted suspension of Dr. Lakehal-Ayat, and the failure of Dr. Railey to recuse himself from the Rank and Tenure portion of the process, finding that Dr. Lakehal-Ayat was denied due process, in violation of the Faculty Statutes is a reasonable conclusion based on the record.

**Investigation Shortcomings**

AAUP principles and guidelines stress that suspension prior to a thorough and fair investigation and a proper hearing is *prima facie* prejudicial against the suspended faculty member. It is prejudicial because suspension is a conclusion of guilt and wrongdoing, and one from which the suspended faculty member may never fully recover:

> Suspension usually implies an extremely negative judgment, for which the basis remains untested in the absence of a hearing. . . . [S]uspension may create a prejudicial atmosphere totally out of proportion to the alleged offense and undeserved in light of the professor's previous record. (AAUP, *The Use & Abuse of Faculty Suspensions*, 2008)

Hence, although it is understandable that the Administration would want to act quickly, a thorough and fair investigation is vital. The investigation into student claims was neither thorough nor fair.

The investigation conducted by Ms. Skrannier relied exclusively on interviews with student accusers of Dr. Lakehal-Ayat; she did not hear from students supportive of Dr. Lakehal-Ayat despite him providing names of such students to Dr. O'Brien nor did she interview Dr. Lakehal-Ayat. As the two College principals most familiar with the investigation, the testimonies of Dr. Railey and Ms Skrainar confirm this conclusion. Dr. Railey, in his testimony, acknowledges that

Report of ad hoc Academic Due Process Committee                                                    28

only "[s]tudents who came forward [with complaints] are students who were include in the investigation" (Internal Hearing Transcript, p. 38, lines 22-23; see also p. 39, lines 6-11). Dr. Railey further acknowledges that the investigation and resulting confidential report to the Rand and Tenure were completed after November 27, 2017 i.e. after Dr. Lakehal-Ayat was suspended and banished (Internal Hearing Transcript, p. 41, lines 18-26; see also p. 42, lines 14-20. This admission alone supports the conclusion that the investigation and resulting report and evidence was designed to sanction the suspension; build a case for terminating Dr. Lakehal-Ayat; and sway the Rank and Tenure Committee to the Provost's position as what the next steps should be.

Ms Skrainar, through her testimony also documents that by "investigate" or "investigation" the College means to speak only to "the students who had come forward with the most serious complaints, the students who had been directly involved in activities that were of concern to them" (Internal Hearing Transcript, p. 128, lines 2-5). Ms Skrainar additionally notes that the only students she interviewed were the not only ones who came forward, but ones referred or sent to her by Dr. Yelkur and Dr. O'Brien (Internal Hearing Transcript, p. 146, lines 22-25; p. 147, lines 1-20). Further, she notes that investigation was not guided by any specific written policy Dr. Lakehal-Ayat was alleged to have violated but was guided instead only by the directive she initially was given to interview the complaining students (Internal Hearing Transcript, p. 155, lines 22-25; p. 156, lines 10-22).

Ms Skrainar further acknowledges that she did not speak to other students in Dr. Lakehal-Ayat's classes who were not complaining or who might be supportive of him, claiming confidentiality as the reason (Internal Hearing Transcript, p. 217, lines 21-25; p. 218, lines 2-7). Ms Skrainer also admits that she did not speak/with or interview Dr. Lakehal-Ayat (Internal Hearing Transcript, p. 153, lines 2-3; see also p. 244, lines 5-10). However, she did interview other members of Finance and Accounting Department to ascertain how they used work-study students (Internal Hearing Transcript, p. 172, lines 4-10).

All student positions funded by work-study funds require a job description. During the course of its work, the Committee asked to see the job descriptions for the School of Business for the 2017 calendar year (the year in which the alleged events of the charges took place). These descriptions were provided by Ms. Skrainer with very little delay. The fact that Human Resources had in its possession these documents, but failed to use them in the original investigation, further shows how insufficient that investigation was, especially given the seriousness of the charges and the suspension for which the investigation was used: The investigation appears to have looked only at one side of the charges, and appears to have been biased against Dr. Lakehal-Ayat.

**Conclusions Regarding Process**

Based upon the evidence and record cited above, a fair and reasonable conclusion is that the College principals in the matter concerning Dr. Lakehal-Ayat failed to provide him with the due process to which he was and is entitled. Regardless of the basis for it, e.g., inexperience, failure to follow appropriate administrative practices and customs, statutory violations, reliance on personal views and opinions, a rush to judgment, or any other reason, this denial is inexcusable and fundamentally undermines tenure at the College. The denial of due process is sufficient to recommend that appropriate corrective and progressive disciplinary action be taken towards the College principals involved in this matter.